M. F. A. MUTUAL INSURANCE COMPANY,
Plaintiff-Appellant,

v.

James ALEXANDER, Dale Keltner, Barbara Jean Keltner, Evan Dale Keltner, William Blevins, Joan Blevins, and Phyllis Blevins, Defendants-Respondents.

Arch M. SKELTON, Guardian Ad Litem of James Mack Alexander, Defendant-Appellant,

v.

M. F. A. MUTUAL INSURANCE COMPANY,
Plaintiff-Respondent,
and
Dale Keltner, Barbara Jean Keltner, Evan Dale Keltner, William Blevins, Joan Blevins and Phyllis Blevins, Defendants-Respondents.

Nos. 8100 and 8102.

Springfield Court of Appeals.

Missouri.

Sept. 20, 1962.

Farrington & Curtis, E. C. Curtis, Jack S. Curtis, Springfield, for M. F. A. Mutual Insurance Company, appellant in No. 8100 and respondent in No. 8102.

Walker, Daniel, Clampett, Rittershouse & Ellis, B. H. Clampett, William A. R. Dalton, Springfield, for respondents Keltners & Blevins, respondents in Cases No. 8100 and 8102.

Arch M. Skelton, Springfield, Guardian Ad Litem of James Mack Alexander, respondent in Case No. 8100 and appellant in No. 8102.

McDOWELL, Judge.

These consolidated appeals are from separate judgments rendered by the trial court of Greene County, Missouri, in a declaratory judgment action brought by plaintiff, M. F. A. Mutual Insurance Company, against the defendants.

In appeal No. 8100, M. F. A. Mutual Insurance Company appeals from declaratory judgment entered against it declaring that it is liable under its automobile insurance policy issued to Willford A. Hill, named insured, decreeing that minor defendant, James Alexander, is an insured within the meaning of the policy and that plaintiff is obligated to defend said James Alexander in cases filed against him by the other defendants herein growing out of an automobile collision and that plaintiff is obligated to pay any judgments rendered against James Alexander in these cases up to the policy limit and allowing a fee of $350.00 for services rendered by Arch M. Skelton, guardian ad litem of Alexander, appointed by the court, to be taxed as costs against plaintiff and from the court's action in denying plaintiff's motion to retax costs.

Appeal No. 8102 is by Arch M. Skelton, guardian ad litem of defendant, James Alexander, from the judgment of the court overruling a motion to adjust the fees allowed said guardian ad litem.

Plaintiff's amended petition, filed February 22, 1961, naming as defendants, James Alexander, Dale Keltner, Barbara Jean

Keltner, Evan Dale Keltner, William Blevins, Joan Blevins, and Phyllis Blevins, states, inter alia, that on or about September 28, 1960, plaintiff issued to one, Willford A. Hill, its policy of liability insurance, No. 1–202402, a copy of which is attached to the petition as exhibit (A) and made a part thereof, and that there now exists an actual controversy between plaintiff and the defendants involving the rights and liabilities of said parties under said contract of insurance, which controversies may be determined in this action without other suits.

That by the provisions of said policy of insurance plaintiff agreed, under certain conditions, to pay upon behalf of the insured all sums up to a certain limit which said insured might become legally obligated to pay as damages because of bodily injury and property damage sustained by any person caused by accident arising out of the ownership, maintenance or use of a certain Studebaker automobile owned by Willford A. Hill and described in the policy and that the word "insured" was defined in said policy as follows:

"The unqualified word 'insured' includes the names insured, and if an individual, his spouse, and:

"With respect to the owned automobile or a substitute automobile, any person or organization using it or legally responsible for its use, provided the actual use of the automobile is by the named insured or spouse, or with permission of either."

That on or about October 27, 1960, Willford A. Hill gave permission to his son, Willford H. Hill, to drive said Studebaker automobile from the Hill residence to Homer Williams Service Station; that said Willford H. Hill drove the automobile to the service station and then permitted defendant, James Alexander, to drive said automobile from said service station to a point on U. S. Highway 66 By-Pass; that Alexander drove to a point on U. S. Highway 160 a distance of several miles from U. S. Highway 66 By-Pass; that at said point the automobile was involved in a collision with an automobile driven by defendant, Barbara Jean Keltner, owned by defendant Dale Keltner; that defendants Evan Dale Keltner, Joan Blevins and Phyllis Blevins were passengers in said automobile; that the automobile was damaged and the occupants of said car received personal injuries; that these defendants have made claim against defendant, James Alexander, for damages arising out of the aforesaid collision.

That there is now a controversy between plaintiff and defendants with respect to the above mentioned claims; that plaintiff contends that James Alexander was not operating said Studebaker automobile with the permission of Willford A. Hill or his spouse at the time of the collision; that James Alexander is not an insured under plaintiff's policy of insurance and plaintiff is not obligated to defend him in any claim or action brought against him by any of the defendants for damages resulting from the collision and that plaintiff would not be liable under its policy of insurance to pay any judgment which might be entered in any action or actions brought against defendant, James Alexander, by defendants or either of them.

That James Alexander contends he is afforded coverage under said policy of insurance for any claim which may be made against him by the other defendants for damages arising out of said collision and that plaintiff under its policy of insurance is obligated to pay any judgment which might be entered against him on any action.

That said defendants contend that James Alexander is afforded coverage under said policy for claim made against him by them or either of them arising out of said collision.

The petition prays that the court adjudicate and determine the rights, liabilities,

duties and legal relations of the parties under the aforesaid policy of insurance and that it adjudge, determine and decree that at the time of the collision referred to defendant, James Alexander, was not operating the Studebaker automobile with the permission of Willford A. Hill or his spouse; that plaintiff is not obligated to defend any suit brought by any of the defendants against James Alexander for damages arising out of said collision and would not be liable for the payment of any judgment or judgments that might be entered in any such suit.

The separate answer of defendants, Dale Keltner, Barbara Jean Keltner, Evan Dale Keltner, William Blevins, Joan Blevins and Phyllis Blevins admits that there is an actual controversy existing between plaintiff and the defendants as to whether (a) plaintiff insured James Alexander under the insurance policy and (b) whether plaintiff is obligated to defend James Alexander thereunder. It avers that there are other actions pending in the Circuit Court of Greene County which were pending at the time the instant action was filed in which the coverage question herein raised can be determined.

The separate answer of defendant, James Alexander, avers that he is afforded coverage under said insurance policy for any claim which may be made against him and that plaintiff is obligated to defend him in such action or claim under the policy of insurance to pay any judgment which might be entered against him in any such action.

He pleads that Willford A. Hill or his spouse, the parents of Willford H. Hill, prior to the 27th day of October, 1960, permitted and extended to their son almost complete control and virtually a blanket authority to use, operate, possess and otherwise treat as his own, the Studebaker automobile in question; that the said Willford H. Hill used and operated this automobile on numerous occasions, including October 27, 1960, without obtaining and without having to obtain specific permission from Willford A. Hill or his spouse; that people in the community thought the car actually belonged to the son and that because of such use, James Alexander was an insured under the policy.

Two alleged errors are assigned as grounds for reversal. First, that the court erred in holding that James Alexander is an "insured" within the meaning of the policy of insurance issued by plaintiff, and, secondly, the trial court's action in allowing $350.00 to the guardian ad litem of defendant, James Alexander, because said services were legal services.

The evidence offered in support of these alleged errors is as follows: The minor defendant, James Alexander, was involved in an automobile accident while driving a 1952 Studebaker car, owned by Willford A. Hill, which had been loaned to defendant by Willford H. Hill, a minor son of Willford A. Hill. The automobile was insured by the plaintiff, M. F. A. Mutual Insurance Company, and the sole legal question presented is whether James Alexander is an insured within the meaning of this policy while driving the car by permission of the owner's son. The evidence overwhelmingly supports the finding of the trial court that the title to the Studebaker automobile at the time of the accident was in Willford A. Hill; that his son had no interest in said car. It was bought for the use of Willford A. Hill's wife and son, the father having a second car for his use.

The policy of insurance, No. 1–202402, was admitted in evidence. Under its terms plaintiff agreed under certain conditions to pay on behalf of the insured all sums within the limits of the policy which the insured might become legally obligated to pay as damages because of bodily injuries or property damages sustained by any person caused by accident and arising out of the ownership, maintenance or use of the 1952 Studebaker automobile, described in said policy.

The term "insured" is defined in the policy as follows:

"The unqualified word 'insured' includes the names insured, and if an individual, his spouse, and:

"(a) With respect to the owned automobile or a substitute automobile, any person or organization using it or legally responsible for its use, provided the actual use of the automobile is by the named insured or spouse, or with permission of either;"

Willford H. Hill, son of Willford A. and Nora Hill, was 18 years of age at the time of the accident and was shown on plaintiff's policy as an underage driver. At the time of the accident, the Hill family lived at Bois D'Arc, Route 1, a little over eight miles west of Springfield, and the father was employed at the Plant Food Division of the M. F. A. in the city of Springfield. They had lived at that location for about two years.

With specific reference to the use of the Studebaker, Mr. Hill testified that his son drove it only after obtaining specific permission on each occasion; that he was strict in granting such permission and always limited its use to a particular place; that there was only one key to the car, which he or Mrs. Hill kept and the son obtained from them when he got the car and gave it back on his return. This testimony was verified by Mrs. Hill and by the son. Willford H. Hill testified:

"Q. Did you have the right to drive the car just any time you wanted to? A. No, sir.

"Q. What did you have to do whenever you wanted to use the car? A. I either had to ask Mom or Dad.

"Q. Did you have to get permission each and every time you used it? A. Yes, sir.

"Q. Did you have to tell them where you were going? A. Yes, sir.

"Q. Did you ever take that car from your home, there, and drive it without specific permission from one or the other of your parents? A. No, sir."

The witness testified that there was only one key to the car which was kept either by his Mom or Dad; that this key was never left in the car. He testified that when he brought the car back he gave the key to his parents; that he drove the car sometimes at night, he thought about three times; that sometimes he would take his sisters to shows and drive to the place of his employment; that he used the car to haul walnuts which were picked up on their farm. He gave this testimony:

"Q. Did you on occasion take this Studebaker automobile and drive it from your parents' home up to the Williams filling station where you work? A. Yes, sir."

He said he didn't drive the car every day he worked at the station; that he would either ride with his father or hitchhike sometimes. He said his father owned another automobile. The evidence is that Mrs. Hill used the Studebaker to go to town or for whatever use she needed it. He gave this testimony:

"Q. Now when you would take the car to work, were you given any instructions by your parents as to what you should do after you got off work? A. I should— they told me to come home, or go over to my brother's house." His brother lived in Springfield about a mile and a half from the Williams Filling Station. Witness testified:

"Q. Now, Willford, did you obtain permission from either of your parents to drive the car to work on October 27th, 1960? A. Yes, sir."

He was asked that during the time his father owned the Studebaker car if he had ever turned it over to anyone else and let them drive it and his answer was that he usually made it a rule not to loan the car.

He said he never let anyone have it that he remembered of. He admitted that when he and James Alexander used the car to pick up walnuts sometimes Alexander backed up the car but he stated that neither of his parents was ever present when Alexander drove the car and that he, at no time, told them about it. He gave this evidence:

"Q. Had James Alexander ever borrowed this car from you before? A. No, sir.

"Q. Had he ever driven it out on the highway, to your knowledge? A. Not that I remember."

On cross examination witness testified that he was a pretty good friend to James Alexander; that they were in school together, separated for a time and renewed their acquaintance about May or June, 1960, shortly after Alexander married; that he knew Alexander's wife, Naomi. He admitted he ran around with him but said "not almost every day". He testified that he worked at the filling station at nights, got off in the morning at 8:00 o'clock and he had, after getting off work, gone to Alexander's house a few times and, on these occasions, drove the Studebaker. He admitted that he had gone to the Alexander home, picked him and his wife up and gone swimming at Grant's Beach but he denied he ever loaned his car to Alexander to go pick his wife up and bring her to the beach after work. He admitted that he and Alexander had picked walnuts up for sale, maybe three or four times a week for a period of five weeks and they used either the Studebaker or Alexander's car. He gave this evidence:

"Q. Who would drive the car when you went walnut picking? A. I would drive.

"Q. All the time? A. Most as I can remember I would."

He testified he had no remembrance of going away from Springfield in the car. He stated he did not make a trip to Joplin with Alexander and his wife that he remembered of. He admitted that on February 10th, he took Alexander and his wife to the drive-in theatre in the Studebaker. He denied that that occurred quite frequently. He testified they went once or twice and that he drove.

Witness testified that on the morning of October 27th Alexander came to the filling station about 8:30 and wanted to borrow the car to see about a job. He stated he thought he was just going to the corner of the By-Pass; that he told him he could use the car; that they had not discussed the matter prior to the morning of October 27th; that Alexander said he was going to the corner to look for a job and he told him to hurry right back with it because he had to have it when he got off work at 1:00 o'clock. His hours were from 8:00 o'clock A.M. until 1:00 o'clock. He gave this evidence:

"Q. Now, had James Alexander ever driven this car of yours prior to this occasion? A. I don't know. He probably had, I don't know."

James Alexander testified that he and Willford H. Hill had been very close friends in high school; that they renewed their association about May or June, 1960, when the Hill boy came by and took him for a ride in the Studebaker. He said that Willford would come by their house at all hours before and after work, early morning and late at night and that they went swimming together, went to drive-in movies, gathered walnuts many times and on one occasion went to Joplin; that they took the Studebaker nearly every time and each of them drove at times. He admitted testifying on deposition that he had never used the car before the day of the accident. He said Willford had asked him to state that he never did drive the car, but admitted he had been advised that if he won this lawsuit he could collect for his medical bills. He also said that he and his wife had driven their car to Hill's house and gone on from there in Hill's car to pick walnuts and that they had never seen the Hill boy obtain the car key from his parents or ask permission

to take the car, but that he had taken the key from his pants pocket or found it in the car.

Naomi Alexander, wife of James, testified to the same facts that her husband testified to except she said they went to Joplin in the afternoon after planning the trip at her mother's, while James Alexander said that they went early in the morning after planning the trip at his father's.

Mrs. Nellie Springer, owner of the apartment where the Alexanders lived, testified that Willford H. Hill visited the Alexanders at all hours of the day and night and that he drove a blue Studebaker.

Mrs. Vera Taylor said she saw the two boys together every day for about a week and that the Hill boy was driving a blue Studebaker.

With regard to the knowledge of Mr. and Mrs. Hill concerning the use of the car by Willford, Mr. Hill testified that he didn't think the boy took the car to Joplin and the boy said he had no recollection of going to Joplin. Mr. and Mrs. Hill testified that they did permit the boy to take the car to work at times, but his instructions were to return home after work, except he was permitted to go to his brother's home once in a while; that they had no knowledge of his running around after work or letting anyone else drive the car; that they never authorized him to permit anyone else to drive it, although they had never specifically told him not to let others drive, except his sisters. Willford H. also testified that he had never been given permission by his parents to allow others to drive the car and that he knew his father would not let others drive his car.

The evidence is that sometime prior to the accident, the Hill boy had been employed at the Snow White Lodge on U. S. 66 By-Pass and at the time of the accident was working part time at the Homer Williams Station at the corner of Division street and 66 By-Pass.

The boy's testimony that he was permitted to take the car and drive to work when he was working at the Williams Service Station was corroborated by the testimony of Homer Williams and a neighbor, John Bishop, who testified that he had taken the boy to work or had seen him walking toward town while the Studebaker was parked in the yard at the Hill home. He also testified that he observed the boy used the car about one night a week.

Defendant Alexander testified that he had made arrangements with Willford Hill to borrow the car while Willford was at work at the station the day before the accident and that his use of it was at the suggestion of Willford. He testified further that on the morning of the 27th he simply went by the station and picked up the car; that there was no conversation as to where he was going and that Willford told him to be back by 4:00 o'clock. However, Homer Williams corroborated the testimony of Willford H. Hill and said the Alexander boy came by the station at 8:30 or 9:00 o'clock on the day of the accident and asked Hill if he could borrow the car to go down to the corner to see about a job that was advertised in the paper.

Mrs. Hill, mother of Willford H., testified that Willford did not work at the station the day before the accident but was at home helping her clean the attic preparatory to moving and that Willford was to get off at 1:00 o'clock the day of the accident.

The scene of the accident was 10.8 miles from the Williams station. The testimony is that Willford did not know Alexander was going so far and did not tell him he could do so. We think the evidence is clear that Willford had no interest in the trip and was not in the car at the time of the accident. Likewise, the evidence is clear that Mr. Hill, the owner, had no knowledge of the fact that Alexander was driving the car until after the accident and would not have permitted it if he had

known. There was nothing connected with the trip to benefit either Mr. or Mrs. Hill.

William Blevins testified that he had talked to Mr. Hill at the hospital the day after the accident with reference to insurance; that Mr. Hill said his son had let the Alexander boy have the car to look for a job at Dayton and he had insurance on the car and had turned it over to the company. Mrs. Blevins testified to a similar conversation with Mr. and Mrs. Hill, alleged to have taken place in her hospital room. Mrs. Longwell testified that at her house, Mr. and Mrs. Hill stated that if their son had given permission for the Alexander boy to drive the car their insurance would cover or they would drop the insurance. Naomi Alexander testified to similar statements.

Mr. Hill said the question of insurance was brought up at the Longwell residence and he said he didn't know whether the company would pay and that he did not say it would cover if Alexander had permission from his son but that it was up to the company. He also testified that in talking to Mr. and Mrs. Blevins he told them he had insurance and had reported it to the company but did not tell them that it would take care of anything.

The trial court, in its memorandum and judgment, stated:

"* * * The father and mother both testified as to very strict control over the son's use of the car, but the weight of the evidence indicated that the son used the car quite a bit, that he and the minor defendant were very close friends and that he had allowed the minor defendant to drive the car on at least several occasions. There was no evidence, however, that the owner had any knowledge of his son allowing anyone else to drive the car or had ever agreed to his son letting anyone else use the car in any fashion.

"Another factor of the case which this Court feels is quite important is that when the father bought the car and bought this insurance policy he listed his son, a minor, as one of the drivers of the car and paid the increased premium for this reason.

"* * * After reading all of these cases this Court feels that we must look at the facts of everyday life. The Plaintiff company contracted to insure against liability anyone driving the car with the permission of the owner. The owner stated in his application for insurance that he had a teenage son who would be driving the car. Everyone knows that teenagers frequently drive each other's automobiles. If the father had given permission to this Defendant to drive this car there would be no question but that the insurance company would have to defend this case. Certainly when a father allows his teenage son to drive his automobile frequently, and for many different purposes, as this father did, we all know that the son may upon occasion allow a friend of his age to use the car for an errand. This is exactly what happened in this case and this Court feels that the Defendant James Alexander is an insured within the meaning of the policy and that in our modern society it is essential for the public as a whole that these policies be construed in this manner. * * *

"WHEREFORE, it is Ordered, Adjudged and Decreed that the Defendant James Alexander is an insured of the Plaintiff within the meaning of the policy attached to this petition, * * *."

In our opinion we will refer to the appellant as plaintiff and to the respondents as defendants, the position of the parties in the lower court.

■■ In cases tried by the court without the aid of a jury courts of appeals must review the facts upon appeal as in suits of an equitable nature; it is the court's responsibility to make its own determination of the facts and where its examination of the evidence impels conclusion that the lower court's findings are clearly wrong, court will not hesitate to make findings contrary to them. However, the judgment shall not be set aside unless clearly erroneous, and

due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Section 510.310 [4] RSMo 1959, V.A.M.S.; Fischman v. Kiphart, Mo. App., 297 S.W.2d 784, 786 [1]; Logan-Moore Lumber Company v. Maddi, Mo. App., 325 S.W.2d 72, 73 [1, 2.].

 Under plaintiff's assignment of error No. 1, it complains of the judgment of the court holding that James Alexander is an "insured" within the meaning of the policy of insurance issued by plaintiff because (A) Alexander did not have the consent or permission of the named insured to drive the insured's automobile at the time of the accident.

In construing contracts courts must give effect to the intention of the parties. The omnibus clause extending coverage of automobile liability policy to person using automobile with permission of named insured should not be construed so as to give clause a meaning which either extends or restricts the coverage beyond that usually provided. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 509 [3, 4, 5]. On page 510 [8] of 323 S.W.2d the court states:

"It is established that the permission contemplated by the omnibus clause can be either express or implied from the conduct and statement of those in position to give it. McKee v. Travelers Ins. Co., Mo.App., 315 S.W.2d 852, 855; Varble v. Stanley, Mo. App., 306 S.W.2d 662, 666; Annotations, 5 A.L.R.2d 608; 160 A.L.R. 1202; 5A Am. Jur., Automobile Insurance, § 94, page 92; 72 A.L.R. 1397. It can, for example, be given by knowledge and acquiescence in such use. 45 C.J.S. Insurance § 829c(2) (b), pp. 897–898; 5A Am.Jur., Automobile Insurance, § 94, pages 92–93; Annotation, 5 A.L.R.2d 610; Cf. McKee v. Travelers Ins. Co., supra. However, the permission contemplated is something more than mere sufferance or tolerance without taking steps to prevent, and the term is used, rather, in the sense of leave, license or authority with the power to prevent. Varble v. Stanley,

Mo.App., 306 S.W.2d 662, supra; 45 C.J.S. Insurance § 829c(2) (b), p. 897.

"It is the general rule that one to whom the insured has given permission to use the automobile has no authority to delegate or grant such permission to another so as to make the latter an additional insured, but the insured's conduct, or the nature and scope of the permission granted by him may be such as to indicate permission to such other, or to authorize the first permittee in turn to permit such other to use the automobile so as to bring the second permittee within the coverage of the policy. See, Risjord-Austin, Automobile Liability Insurance Cases, Chapter 20, pages 127–28; 45 C.J.S. Insurance § 829c(2) bb, p. 901; Annotations, Automobile Insurance—'Omnibus' Clause, 72 A.L.R. 1401, 160 A.L.R. 1210, 5 A.L.R.2d 643; 5A Am.Jur., Automobile Insurance, Sec. 96, page 96ff.; * * *". 27 M.L.R. (1962) p. 25 (B. Permissive User); Speidel v. Kellum, Mo. App., 340 S.W.2d 200, 202 [1].

In Varble v. Stanley, Mo.App., 306 S.W. 2d 662, 665 [4–7], Judge Ruark, speaking for this court, stated:

"There is no question that the permission provided in the omnibus clause can be either express or implied from the conduct of those in a position to give it. But as a general rule the person claiming such permission must prove it, and no implied permission can arise merely because someone obtained possession of the property and used it without the knowledge of the named insured."

M. F. A. Insurance Company v. Lawson, Mo.App., 336 S.W.2d 123, was a declaratory judgment action to determine insurer's liability for injuries received in collision caused by the driver of the insured's automobile. The same question was involved in this suit as in the instant case under the same omnibus clause. The question presented is, was the *actual use* of the automobile *at the time* the collision occurred with the *permission* of the insured or his spouse?

The facts in the case were: Udell Hayes owned an automobile and had a liability policy with an omnibus clause similar to that of the policy under consideration here. His wife had a sister named Lenora Kelly. Mrs. Hayes drove the car to work, called her sister and asked her to run an errand for her in the car, directed her to go straight to a floral shop and return and bring back the keys. Kelly drove to the home of defendant, Lawson, and with her as a passenger completed the errand. She then drove around town for a while and later to a beer stand where she allowed Lawson to drive. Lawson drove two or three miles out on the highway, struck a car causing the injuries complained of. The court found there was no evidence that either Hayes or his wife knew that Lawson would, or did, drive the car until after the accident. The court said the question was: "Was the *actual use* of the automobile *at the time* the collision occurred, with the *permission* of insured, or his spouse?" The court found that the evidence overwhelmingly tends to prove that there was not permission given. In its ruling it stated: "There is no room here for application of the rule of prior conduct", citing Haynes v. Linder, Mo.App., 323 S.W.2d 505, par. 9.

In Horn v. Allied Mutual Casualty Company, 10 Cir., 272 F.2d 76, the court discusses the interpretation of omnibus clause of an automobile liability policy issued in Kansas. The action was for a declaratory judgment by the insurer to determine liability under automobile policy. The facts were that the insured permitted his stepdaughter to drive the insured's automobile to school but did not give her permission to allow others to drive it prior to the day of the accident. She permitted the defendant to drive the automobile when she was not present. The driving was in no sense for the benefit of the insured or the insured's permittee and the court held that neither the step-daughter nor permittee was within coverage of the liability policy which covered permittee only when automobile was in actual use with permission of insured.

We are indebted to the attorneys, both for plaintiff and defendants for able briefs and discussion of both the law and the facts in the instant case. The question here involved has been before the appellate courts in Missouri and in nearly all the states in the Union and almost every phase of the issue here presented has been discussed. We have cases cited in the briefs of both plaintiff and the defendants and we think the law is well settled in this state and clearly stated in Haynes v. Linder, Mo. App., 323 S.W.2d 505, 510, to-wit:

"It is established that the permission contemplated by the omnibus clause can be either express or implied from the conduct and statement of those in position to give it. * * * However, the permission contemplated is something more than mere sufferance or tolerance without taking steps to prevent, and the term is used, rather, in the sense of leave, license or authority with the power to prevent."

The general rule that one to whom the insured has given permission to use the automobile has no authority to delegate or grant such permission to another so as to make the latter an additional insured but the insured's conduct or the nature and scope of the permission granted by him may be such as to indicate permission to such other or to authorize the first permittee in turn to permit the other to use the automobile so as to bring the second permittee within the coverage of the policy. Winterton v. Van Zandt, Mo.Sup., 351 S.W.2d 696.

An examination of the facts in the instant case impels us to reach a conclusion that the lower court's findings are clearly wrong and that the judgment is erroneous. We find from the evidence that the insured's conduct or the nature and scope of the permission granted by him to his son is insufficient to indicate permission to his son to authorize him to permit Alexander to use the automobile so as to bring the second permittee within the coverage of the policy. James Alexander testified in a deposition

that this was the only time he was ever permitted to drive the Studebaker automobile. In the trial of the case he changed his testimony. Yet, the evidence is clear that Alexander had never before driven the car unless Willford H. Hill was with him and there is no evidence that the insured had any knowledge that his son had ever permitted anyone else to drive the car.

The evidence is that when the insured took out the policy of insurance with plaintiff he designated his son as a minor member of the family who would drive the car. Under the reasoning of the trial court if a father permitted his son to drive the car he would necessarily have knowledge that he would permit his friends to also drive it. We cannot agree with this reasoning.

We find there is no merit in the second alleged error complaining of the trial court's action in allowing $350.00 to the guardian ad litem of defendant, James Alexander. The law is that the trial court has power and authority to allow a guardian ad litem compensation for his services under implied power to appoint, as one of the court's inherent powers. Jones v. Yore, 142 Mo. 38, 47–48, 43 S.W. 384, 387. The duty of the guardian ad litem so appointed is to defend the suit and he cannot admit anything or waive anything which goes to sustain the adverse party's claim. The office does not involve only perfunctory or shadowy duties. The guardian is to do for him what with riper judgment he would do for himself. It is the duty of said guardian to employ competent attorneys and counsel to prepare and plead his case; to collect testimony, summon witnesses, and at the trial to afford such aid to his counsel as may be necessary in unexpected difficulties. That is what the guardian ad litem did in this case and the court's judgment allowing him attorney fees should be sustained. Spotts v. Spotts, 331 Mo. 917, 55 S.W.2d 977, 983 [10, 11], 87 A.L.R. 660.

It is, therefore, ordered that the judgment of the trial court in case No. 8100 be reversed and the cause remanded with in-

structions to enter judgment in accordance with the prayer of plaintiff's amended petition.

Appeal case No. 8102 involves an appeal by the guardian ad litem from the judgment of the court overruling the motion for rehearing on the amount of fee of $350.00 allowed by the trial court for services rendered as guardian ad litem and asks that the fee be adjusted to at least $600.00.

It is the contention of plaintiff that the judgment of the trial court for $350.00 should be reversed for the reason that separate allowances should be made for services of the same person as guardian ad litem and as attorney for minor defendant. This law was declared in Franz v. Buder, 8 Cir., 38 F.2d, 605.

In the instant case plaintiff brought an action for declaratory judgment naming James Alexander, a minor, as defendant. Under Section 507.190 RSMo 1959, V.A.M.S.—Suits against infants not to proceed without guardian, it is provided: "After the commencement of a suit against an infant defendant, and the service of process upon him, the suit shall not be prosecuted any further until a guardian for such infant be appointed."

Under this section of the statute the trial court appointed Arch M. Skelton, an attorney at law as guardian ad litem for such minor defendant. At the end of the trial, in which Mr. Skelton rendered very efficient services in behalf of the minor, as guardian ad litem, the trial court allowed him a fee of $350.00 to be assessed as costs in the case.

It was held in Tracy v. Martin, 363 Mo. 108, 249 S.W.2d 321, 323 [2] that the only statutes authorizing circuit courts to make an allowance to a guardian ad item seem to be in partition suits (§ 528.530, "shall be taxed and paid as other costs in the case"), and in proceedings for the formation and administration of drainage and levee districts (§ 246.190, "out of the moneys in the funds of the districts"). But apart from

such provisions, it is held that the power and authority to allow a guardian ad litem compensation for his services is implied from power to appoint, as one of the court's inherent powers. Jones v. Yore, 142 Mo. 38, 47–48, 43 S.W. 384, 387.

In Spotts v. Spotts, 331 Mo. 917, 55 S.W. 2d 977, 983, [10, 11] the law is stated: " * * * The duty of the guardian ad litem so appointed is to defend the suit and he cannot admit anything or waive anything which goes to sustain the adverse party's claim. (Citing authority). This court has clearly stated that the appointment of a guardian ad litem for an infant defendant is not a bare technicality and that the office does not involve only perfunctory or shadowy duties, saying: 'This guardian is to do for him what with riper judgment he would do for himself. He is to appear for him in his proper person, employ competent attorneys and counsel to prepare and plead his cause. He is to collect testimony, summon witnesses, and at the trial to afford such aid to his counsel as may be necessary in unexpected difficulties. It is only by exercising that attention and vigilance in the cause of the minor, which he would exert in his own, that he fairly discharges his duty. * * *' "

As shown by the record in this case the guardian ad litem, being an attorney at law, performed all these duties and we think the court had inherent power to allow him the fee of $350.00 for the services rendered as guardian ad litem.

However, from the evidence we think the trial court committed no error under the facts presented in overruling the guardian ad litem's motion to increase the amount of allowance to $600.00.

Judgment of the trial court in case No. 8102 affirmed.

RUARK, P. J., and STONE, J., concur.